1  HUGHES HUBBARD & REED LLP
   Rita M. Haeusler, Bar No. 110574
2  haeusler@hugheshubbard.com
   350 South Grand Avenue
3  Los Angeles, California 90071-3442
   Telephone: (213) 613-2800
4  Fax: (213) 613-2950

5  Dennis S. Klein, [*pro hac vice* application forthcoming]
   klein@hugheshubbard.com
6  201 South Biscayne Boulevard
   Miami, Florida 33131-4332
7  United States of America
   Telephone: (305) 358-1666
8  Fax: (305) 371-8759

9  Attorneys for Plaintiff
   FEDERAL DEPOSIT INSURANCE CORPORATION
10 AS RECEIVER FOR FIRST REGIONAL BANK

11

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14

15 FEDERAL DEPOSIT INSURANCE
   CORPORATION AS RECEIVER FOR          No. CV14-0668 PRO-JEMx
16 FIRST REGIONAL BANK,
                                        **COMPLAINT FOR**
17                    Plaintiff,        **NEGLIGENCE, GROSS**
                                        **NEGLIGENCE, AND BREACH**
18                                      **OF FIDUCIARY DUTY**
          vs.
19
                                        **DEMAND FOR JURY TRIAL**
20 FRED M. EDWARDS, H. ANTHONY
   GARTSHORE, THOMAS E.
21 MCCULLOUGH, CAROLYN ZARRO
   NICHOLSON, COLLEEN CARSON
22 (NÉE O'ROURKE), KLAUS
   SCHILLING, RICHARD E.
23 SCHREIBER, LAWRENCE J.
   SHERMAN, JACK A. SWEENEY,
24 THE ESTATE OF MARILYN J.
   SWEENEY, AND STEVEN J.
25 SWEENEY,
26
27                    Defendants.
28

-1-

Plaintiff Federal Deposit Insurance Corporation ("FDIC") as Receiver for First Regional Bank ("First Regional" or "Bank"), for its Complaint, states as follows:

I.   **INTRODUCTION**

1.   This action is brought by the FDIC in its capacity as Receiver for First Regional ("FDIC-R) pursuant to authority granted to it by 12 U.S.C. § 1821.

2.   The FDIC-R seeks to recover losses of at least $72.46 million the Bank suffered because Defendants – eleven of its former directors and/or officers – negligently, grossly negligently, and in breach of their fiduciary duties approved ten poorly underwritten acquisition, development and construction ("ADC") and commercial real estate ("CRE") loans (collectively, the "Loans") between December 8, 2005 and April 5, 2007.  In this lawsuit, the FDIC-R does not seek to collect from First Regional's borrowers or guarantors on any unpaid loans, but rather seeks to collect damages from the Defendants for negligence, gross negligence, and breaches of fiduciary duties. The compensatory damages sought herein are those caused by the Defendants' tortious and wrongful conduct in approving such lending of depositors' money, which is the direct and proximate cause of the damages the FDIC-R now seeks to recover.

3.   The FDIC-R's damages stem from Defendants' significant departures from "safe and sound" banking practices.  Defendants repeatedly disregarded First Regional's Loan Policy and approved loans to borrowers who were not creditworthy and/or for projects that provided insufficient collateral.  These loans had little chance of repayment and thus compounded the Bank's risk exposure.  Defendants pushed to grow loan production despite substantial warnings that a significant downturn in the market was imminent and, in some instances, after that decline was already well underway. Defendants' decision to do so was especially unreasonable because the ADC and CRE loans they approved were especially vulnerable to even modest downturns in the real estate market.  Defendants' imprudent decisions to continue approving the Loans highlighted in this action under these circumstances were negligent, grossly negligent,

1   and constituted breaches of Defendants' fiduciary duties.

2   **II.      THE PARTIES**

3   **A.      PLAINTIFF**

4        4.      Plaintiff FDIC-R was appointed as Receiver for First Regional on January

5   29, 2010, by the California Department of Financial Institutions ("CDFI").  Pursuant to

6   12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all rights, titles, powers, and

7   privileges of First Regional, First Regional's stockholders, accountholders, and

8   depositors, including, but not limited to, First Regional's claims against the Bank's

9   former directors and officers as set forth herein.

10   **B.      DEFENDANTS**

11        5.      Fred M. Edwards ("Edwards") was a director from 1999 until the Bank

12   closed, and a member of the Senior Loan Committee ("SLC") from at least January 7,

13   1999 until the Bank closed.

14        6.      H. Anthony Gartshore ("Gartshore") was the President and a director from

15   June 1996, Chief Executive Officer ("CEO") from January 2, 2008, and an SLC

16   member from January 1999 until the Bank closed.

17        7.      Thomas E. McCullough ("McCullough") was a director from 1997 until

18   the Bank closed, and a member of the SLC from at least January 1999 until the Bank

19   closed.  He was also the Chief Operating Officer ("COO") and an Executive Vice

20   President ("EVP") from June 18, 1987 until the Bank closed.

21        8.      Carolyn Zarro Nicholson ("Nicholson") was a Senior Vice President

22   ("SVP") of Real Estate Lending for the Bank from April 1, 1989, and an EVP and

23   Senior Real Estate Officer from at least September 16, 1999 until the Bank closed.  She

24   was also a member of the SLC from at least July 16, 1998 until the Bank closed.  Upon

25   information and belief, Nicholson may have recently filed for bankruptcy protection.  If

26   so, recovery is sought from her only to the extent of available insurance coverage, and

27   not from her personal assets.

28        9.      Colleen Carson, formerly known as Colleen O'Rourke ("O'Rourke"), was

-3-

a commercial loan officer for the Bank from 1995, and was an EVP Regional Manager from at least January 6, 2005 until the Bank closed.   She was also a member of the SLC from at least July 16, 1998 until the Bank closed.

10.     Klaus Schilling ("Schilling") was the EVP of the Los Angeles Branch from 2004 until the Bank closed, and a member of the SLC from May 13, 2004 until the Bank closed.

11.     Richard E. Schreiber ("Schreiber") was a director from 2003 until the Bank closed, and a member of the SLC from at least March 25, 2004 until the Bank closed.

12.     Lawrence J. Sherman ("Sherman") was a director from 1981 until the Bank closed, and a member of the SLC from at least January 7, 1999 until the Bank closed.

13.     Jack A. Sweeney ("J. Sweeney") was a director and Chairman of the Board ("COB") from 1980 to January 2, 2009, and a member of the SLC from at least January 1999 to January 2, 2009.  He was also the Chief Executive Officer ("CEO") from 1980 to January 2, 2008, and the Chief Credit Officer ("CCO") from at least January 11, 2006 to October 2007.  However he continued to attend various directors' committee meetings until August 18, 2009, and to attend SLC meetings as a non-member until June 4, 2009.

14.     Marilyn J. Sweeney ("M. Sweeney"), J. Sweeney's wife, was a director from 2001 until the Bank closed, and a member of the SLC from March 1, 2001 until the Bank closed.  Mrs. Sweeney died on or around May 10, 2013. The FDIC-R's claims are brought against her estate.

15.     Steven J. Sweeney ("S. Sweeney"), J. Sweeney's son, was a director from 1995 to 1996 and from May 2003 until the Bank closed, and a member of the SLC from June 19, 2003 until the Bank closed.  He was also an EVP and General Counsel from July 2003 until the Bank closed.

## III.   **JURISDICTION AND VENUE**

16.     The Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12

-4-

U.S.C. § 1811, *et seq.*; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345.

17.    This Court has personal jurisdiction over Defendants who are residents of the State of California and/or who at all times conducted the business of the Bank in the State of California.

18.    This Court has personal jurisdiction over each of the Defendants named in this action pursuant to California Code of Civil Procedure § 410.10.

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the claims and causes of action asserted in this Complaint arose in this district.

## IV.    FACTUAL ALLEGATIONS

### A.    BACKGROUND

20.    First Regional was founded on December 31, 1979 and operated primarily in Southern California.  The Bank's main office was in Los Angeles County, which is also where more than three quarters of its total deposits were held.  The Bank focused primarily on high net worth individuals and businesses, which resulted in a deposit base that was generated by a relatively small number of accounts with very high average balances.

21.    In the early 2000s, First Regional pursued an aggressive growth policy that centered on heavily concentrated CRE lending.  For a brief time, this strategy yielded dramatic growth and profits.  From December 31, 2002, to December 31, 2005, the Bank's total assets quadrupled from approximately $406 million to over $1.81 billion. This growth was almost exclusively concentrated in CRE loans.  By the end of 2005, the Bank's $1.54 billion CRE loan portfolio equaled 956 percent of the Bank's Tier 1 Capital, and comprised 88 percent of the Bank's $1.75 billion total loan portfolio.

22.    However, the Bank continued to aggressively expand the Bank's CRE lending even after the real estate market began to decline in 2006.  Significantly, eight of the ten Loans were approved during this period.  By June 30, 2008, the Bank's CRE loan portfolio had ballooned to over $2.42 billion, or a staggering 98 percent of the

Bank's total assets, and 1,119 percent of the Bank's Tier 1 Capital, which placed the Bank in the bottom 96th percentile among its peer group institutions.

23.     The Bank's borrowers for the Loans, many of whom were highly leveraged, became unable to service their respective debts when the real estate market slid into a steep decline during late 2007 and early 2008.  From December 31, 2006, to December 31, 2007, the total balance on the Bank's past due loans rose from roughly $500,000 to over $23 million.  By December 31, 2008, that figure exceeded $200 million, and by December 31, 2009, it exceeded $400 million.  Over the same time period, the Bank's net income plummeted from over $46 million in 2006 to negative $120 million in 2009.

24.     On January 29, 2010, First Regional was closed by CDFI with $2.08 billion in assets.  The FDIC was appointed as Receiver of the Bank.  The losses to the Deposit Insurance Fund stemming from First Regional's collapse are currently estimated at $522 million.

**B.     FIRST REGIONAL WAS THE SUBJECT OF REGULATORY CRITICISM**

25.     Defendants knew, or in the exercise of reasonable due diligence should have known, that their practices and the practices of First Regional's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to First Regional.

26.     Between 2005 and 2007, Defendants repeatedly ignored warnings from regulators that the Bank carried unsafe concentrations of credit in individual borrowers and in CRE loans, and that the Bank habitually approved loans based on unsound underwriting.

27.     For example, on June 27, 2005, regulators criticized the Bank's underwriting and loan approval process, citing "several instances wherein changes were made to loan terms after the [SLC] had approved loan terms" and that the Bank's sole appraisal reviewer had no "prior experience or formal training in evaluating appraisals"

-6-

1    and was also not independent of the Bank's loan production.

2         28.    On August 29, 2006, regulators warned that "large concentrations of

3    commercial real estate loans continue[d] with no limits set by management."  They also

4    noted several credit administration deficiencies, including the failure to establish limits

5    for real estate credit concentrations, monitor market conditions, and establish an

6    independent appraisal review process.

7         **C.    FIRST REGIONAL'S LOAN POLICY WAS NOT**

8              **FOLLOWED AND ENFORCED BY THE DEFENDANTS.**

9         29.    First Regional's Loan Policy provided that loans up to the Bank's legal

10   lending limit could be approved by the SLC.  Loan approval authorities were based on

11   the total credit amount outstanding to the borrower at the time of approval.  Each

12   Defendant was a member of the SLC, and each Loan was approved by the SLC.  The

13   Defendants' roles on the SLC required that they comply with the Loan Policy.  By

14   repeatedly ignoring Loan Policy violations that were clear on the face of the credit

15   memoranda used to present the Loans to the Defendants in their capacity as loan

16   approvers prior to voting on loans ("Credit Memoranda")[1], the Defendants completely

17   abdicated their responsibilities to ensure that loans were made in accordance with the

18   Bank's Loan Policy and safe and sound banking practices.

19        30.    Under the Loan Policy, the Bank required for each Loan financial

20   statements that were less than six months old, two years of signed or certified tax

21   returns, and credit reports for all borrowers and guarantors.  In addition, the Loan Policy

22   required a documented secondary source of repayment and a cash flow analysis for each

23   Loan.  The Loan Policy noted that a cash flow analysis was critical in assessing

24   creditworthiness.

25        31.    The Loan Policy also required an underwriter to review the file for each

26

27   _____

28   [1] The Credit Memoranda at issue in this Complaint were alternatively referred to as "Records of
     Loan," "Requests for Loan Approval," and "Request for Approval."

-7-

Loan containing the required borrower financials, third-party reports, and any other supporting documentation.  The underwriter was supposed to analyze the loan file (including project collateral, borrower and guarantor liquidity, cash flow, credit history, character, and desire to repay), prepare the Credit Memorandum, and sign the Credit Memorandum indicating that he or she recommended the loan for approval.  The Loan Policy required the underwriter to identify two sources of repayment in the Credit Memorandum and any exceptions to the Loan Policy.

32.    The Loan Policy established limits on permissible loan-to-value and debt service coverage ("DSC") ratios.  Loan-to-value ratio limits were 65 percent for raw land, 75 percent for ADC loans, 80 percent for commercial, multifamily, and other nonresidential construction loans, and 85 percent for improved property.  At least after March 6, 2007, the minimum DSC ratio for "mini-perm" loans[2] was 1:1.

33.    The Loan Policy limited construction loans to projects that were compatible with the neighborhood and that could be sold within eighteen months or less.  Interest reserves were required for all construction loans.  Undesirable loans included credits to individuals or businesses that were located, or secured by property that was located, "in geographic areas which the Bank cannot reasonably service from its location" and loans without a secondary source of repayment.  The Bank's primary lending territory was Los Angeles County.

34.    After the underwriter prepared and signed the Credit Memorandum for each Loan, it was emailed with the supporting attachments to the SLC members the day before the meeting.  The supporting attachments typically included a copy of a map showing the location of the property, financial statements, tax returns, and cash flow analyses for the borrower, guarantor, and any significant entities associated with the

---

[2] A "mini-perm" loan was defined by the Bank's Loan Policy as "a [real estate] loan secured by a deed of trust/mortgage where the primary reliance for repayment is the: property, if the borrower shows sufficient personal cash flow; the cash flow generated from the property, or; the ability of the property to qualify for financing from other financial institutions."

borrower.  Full appraisals were typically available at the SLC meetings.  The SLC met weekly and on an as-needed basis.  After the underwriter presented the loan, any questions regarding the loan were addressed, the SLC summarily voted on the loan, the Secretary of the SLC ("Secretary") recorded attendance and loan approval votes, which were noted in the SLC meeting minutes and approved at the next meeting, and the Secretary signed or stamped the Credit Memorandum if the loan was approved.

## D. DEFENDANTS IMPROVIDENTLY VOTED TO APPROVE TEN LOANS IN THE TOTAL AMOUNT OF $138.98 MILLION IN DISREGARD OF SOUND BANKING PRINCIPLES AND THE BANK'S OWN LOAN POLICY.

35.    The ten Loans are ADC and CRE loans approved between October 6, 2005 and April 5, 2007.

36.    Numerous violations of the Bank's Loan Policy and other significant underwriting deficiencies are apparent on the face of the Credit Memoranda for all ten Loans.  Deficiencies included ignoring discrepancies in financial evaluations, excessive loan-to-value ratios, and ignoring discrepancies in analyses of project financials and appraisals.  Yet the Defendants, with willful ignorance and without reasonable inquiry, voted to approve all of the ten Loans.

37.    No Defendant voted against any of the Loans.  Some of the Defendants failed to attend certain meetings and thus did not vote on loans presented at these meetings.

38.    The Credit Memoranda provided to the Defendants prior to a vote on each of the ten Loans were facially deficient; as such, the Defendants were not entitled to rely upon them.

39.    The Loans are as follows, by date made:

| The Ten Loans | | | | Approvals | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrower | Approval Date | Loan ($ millions) | Loss ($ millions) | Edwards | Gartshore | McCullough | Nicholson | O'Rourke | Schilling | Schreiber | Sherman | J. Sweeney | M. Sweeney | S. Sweeney |
| 1.  Pointe Mtntp. | Oct. 6, 2005 | $25.90 | $15.64 | x | x | x | x | x | x | x | x | x | x | x |
| 2.  Narang | Dec. 8, 2005 | $23.26 | | x | x | | x | x | x | x | | x | x | x |
| | Jan. 26, 2006 | $0.29 | $11.44 | x | x | | x | x | x | x | | x | x | x |
| | Feb. 2, 2006 | $0.13 | | x | x | x | x | x | | x | | x | x | x |
| 3.  Howe Arden | Feb. 16, 2006 | $11.05 | $3.40 | x | x | x | x | | | x | x | x | x | x |
| 4.  Howe Arden | Feb. 16, 2006 | $1.30 | | x | x | x | x | | | x | x | x | x | x |
| 5.  Howe Arden | Feb. 16, 2006 | $12.02 | $5.50 | x | x | x | x | | | x | x | x | x | x |
| 6.  Howe Arden | Feb. 16, 2006 | $1.41 | | x | x | x | x | | | x | x | x | x | x |
| 7.  SCI R.E. Inv. | Jul. 6, 2006 | $10.00 | $ 9.00 | x | x | x | x | | | x | x | x | x | x |
| 8.  Villas at Sparks | Nov. 2, 2006 | $24.59 | $15.33 | | x | x | x | x | x | | | x | x | x |
| 9.  Residencia | Dec. 14, 2006 | $12.45 | $ 2.30 | x | x | x | x | | | x | x | x | x | x |
| 10. Crestridge Est. | Apr. 5, 2007 | $16.58 | $ 9.85 | | x | x | x | | | x | x | x | x | x |
| **TOTAL** | | **$138.98** | **$72.46** | | | | | | | | | | | |

### i.  The Pointe Mountaintop Homes, LLC ($25.90 million)

40.     On or around October 6, 2005, Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved a $25,900,000 loan to The Pointe Mountaintop Homes, LLC ("Pointe Mountaintop").  This loan was intended to provide construction and site development financing for a 57-unit residential condominium project (Phase I) located in Spring Valley, California.  Additionally, the loan was to provide for the site development for an additional 54 units (Phase II).

41.     Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney  acted with negligence, gross negligence, and in breach of their fiduciary duties in approving the loan without adequate information and in the face of numerous violations of the Bank's Loan Policy and generally accepted prudent lending practices and principles.  The Credit Memorandum reported the loan-to-value ratio of the loan as 71.9 percent – within the Bank's maximum ratio of 75 percent – but was calculated using the aggregate

-10-

sell out value of the completed project, rather than the discounted bulk value, which was not obtained. The discounted bulk value considers the holding and sales costs of the property and accounts for entrepreneurial profit – expenses the Bank would have to incur if it were forced to sell the property to repay the loan. These additional expenses would likely have increased the true loan-to-value ratio above the Bank's maximum.

42. The loan was also approved without ensuring that the necessary building permits were in place. This placed an additional risk with the Bank that the project would be delayed or modified.

43. Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney also approved the loan without adequate financial information or analysis on the borrower and principal. The Credit Memorandum failed to present any cash flow analysis and there is no discussion of the borrower's or principal's other liabilities or financial obligations. Based on this information, these Defendants could not have known whether the borrower or principal could adequately service the debt if the project was delayed – a significant risk, especially considering that the building permits were not issued at the time of approval.

44. Furthermore, Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney are liable for failing to require a full financial guarantee from the borrower's principal. In the event the project failed, the Bank would have no recourse other than sale of the property.

45. This failure was especially egregious considering the borrower's precarious financial condition. The brief financial information presented in the Credit Memorandum indicates that the borrower had a net worth of <u>negative</u> $4,366,877, with the majority of its assets centered in real estate. If the borrower were to be called upon to service the debt, it would be unlikely to have the means to do so.

46. Finally, as noted in the Credit Memorandum, a market feasibility study on

-11-

the project was required but had not yet been received at the time of approval. Without this information, Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney could only speculate as to the project's feasibility.

47.   As a direct and proximate result of Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney's approval of this loan despite the foregoing deficiencies, First Regional suffered damages estimated to be $15.64 million.

### ii.  Narang Acquisition Group LLC ($23.26 million)

48.   On or around December 8, 2005, Defendants Edwards, Gartshore, Nicholson, O'Rourke, Schilling, Schreiber, J. Sweeney, M. Sweeney, and S. Sweeney approved a $23,256,000 construction Loan to Narang Acquisition Group LLC. On or around January 26, 2006, Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, J. Sweeney, M. Sweeney, and S. Sweeney approved an increase in the loan amount to $23,550,000. On or around February 2, 2006, Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schreiber, J. Sweeney, M. Sweeney, and S. Sweeney approved an increase in the loan amount to $23,680,000. The loan was intended to provide construction financing for a 40-unit residential condominium project with retail space known as Lavender Courtyard.

49.   Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, J. Sweeney, M. Sweeney, and S. Sweeney acted with negligence, gross negligence, and in breach of their fiduciary duties in approving the loan without adequate information and in the face of numerous violations of the Bank's Loan Policy and generally accepted prudent lending practices and principles. The Bank's Loan policy required the Credit Memorandum to have "quantitative and qualitative information that reasonably will serve as a base for evaluation" of the proposed loan. Nevertheless, the Credit Memorandum used to support approval of the loan lacked the basic financial and underwriting information that would have allowed Defendants

-12-

Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, J. Sweeney, M. Sweeney, and S. Sweeney to make an informed decision, such as (a) the borrower's qualifications and banking relationships; (b) credit reports on the borrower and guarantor; (c) analyses of financial statements and tax returns of borrower and guarantor; (d) appraisal, information on the type of appraisal and key assumptions such as market absorption rate, project plans, construction budgets, and marketability of the completed project; (e) conditions and covenants of loan agreements; and (f) the inherent risks involved with the loan.

50.     The borrower's principal, who was also the guarantor of the loan, additionally lacked the requisite skills and experience as a developer to successfully complete a project of this size and scope.  The Bank's Loan Policy required "[t]he developer and contractor [to] submit a resume which shows they have successfully completed comparable projects."  The Lavender Courtyard project was approximately twenty times larger than any comparable project disclosed on the guarantor's financial statement.  Moreover, the guarantor's 2003 and 2004 federal tax returns – the most recent available at the time of the loan's approval – showed that his income for those years was attributable to his futon wholesaling business, not real estate profits or rental income.

51.     Despite a heightened risk due to the developer's lack of experience, Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, J. Sweeney, M. Sweeney, and S. Sweeney failed to require an adequate source of repayment other than the project funded by the loan.  The guarantor's personal financial statement showed that his assets were heavily concentrated in illiquid real estate and his closely held business, which would be difficult to liquidate if the guarantor were called upon to personally service the debt.

52.     Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Schreiber, J. Sweeney, M. Sweeney, and S. Sweeney ignored numerous other indications that this loan should not be approved.  For example, the guarantor's financial

1  statement was not signed, as required by the Loan Policy.  There was also no indication

2  that the Bank verified the information presented in the guarantor's financial statement,

3  as required by the Loan Policy.  Finally, the guarantor's financial statement showed

4  total annual income of $245,000, but his corresponding tax return showed adjusted

5  gross income of $73,949.  There was no explanation on file concerning this large

6  difference.

7      53.     As a direct and proximate result of Defendants Edwards, Gartshore,

8  McCullough, Nicholson, O'Rourke, Schilling, Schreiber, J. Sweeney, M. Sweeney, and

9  S. Sweeney's approval of this loan despite the foregoing deficiencies, First Regional

10  suffered a loss estimated to be $11.44 million.

11      **iii.  Howe Arden Business Park LLC**

12      54.     On or around February 16, 2006, Defendants Edwards, Gartshore,

13  McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and

14  S. Sweeney approved four loans to an "entity to be named" owned by R.N.  The entity

15  was later designated as Howe Arden Business Park LLC ("Howe Arden").  The four

16  loans provided $25,783,000 in financing for R.N.'s purchase and rehabilitation of two

17  98-unit apartment buildings in Las Vegas, Nevada known as Hualapai Way and Grass

18  Meadows.

19      55.     Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling,

20  Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney negligently, grossly

21  negligently, and in breach of their fiduciary duties approved the four Howe Arden loans

22  even though each of the loans violated the Bank's Loan Policy and generally accepted

23  prudent lending principles and practices in many respects.  For example, Defendants

24  Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J.

25  Sweeney, M. Sweeney, and S. Sweeney approved financing for the Hualapai Way and

26  Grass Meadows projects structured as four loans to circumvent the Bank's 85 percent

27  maximum loan-to-value ratio.  A $12,019,000 secured loan and a $1,414,000 unsecured

28  loan were approved for the purchase and rehabilitation of the Hualapai Way project, and

an $11,050,000 secured loan and a $1,300,000 unsecured loan were approved for the purchase and rehabilitation of the Grass Meadows project. The combined loan-to-value ratio of the loans approved for the Hualapai Way project was 95 percent, and the combined loan-to-value ratio of the loans approved for the Grass Meadows project was 95 percent – far in excess of the maximum 85 percent permitted by the Loan Policy.

56.    This structure also required R.N. to contribute equity of only 5 percent, a level far below generally accepted banking practices and the amount of equity required by the Bank's own Loan Policy. The Loan Policy required the "borrower to have equity in the project and to assume a sufficient level of risk." The total cost of acquisition and renovation of the Hualapai Way project was $14,140,000, while the two loans approved for that project totaled $13,433,000. Similarly, the total cost of acquisition and renovation of the Grass Meadows project was $13,000,000, while the two loans approved for that project totaled $12,350,000. In other words, for both projects, R.N. contributed only five percent equity, an unquestionably inadequate level by generally accepted commercial real estate lending standards.

57.    All four Howe Arden loans – totaling $25,783,000 – also represented an unsafe concentration of credit in a single borrower.

58.    Moreover, because both projects were based in Las Vegas, Nevada, the four loans each were outside the Bank's lending territory as defined in the Loan Policy.

59.    Each loan is discussed in greater detail below:

            a.    Howe Arden Business Park LLC ($11.05 million)

60.    This loan, together with the related unsecured loan for $1,300,000 (*see infra* ¶¶ 67-72), was intended to provide financing for the acquisition and renovation of the Grass Meadows apartment complex. In addition to the deficiencies applicable to all four Howe Arden loans, described above (*see supra* ¶¶ 54-59), Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney acted with negligence, gross negligence, and in breach of their fiduciary duties in approving this loan despite the following deficiencies.

-15-

61.     Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved the loan even though the project had inadequate debt service coverage.  The Bank's Loan Policy required a DSC ratio of at least 1.00, and generally accepted banking practices require a minimum DSC ratio in the range of 1.20 to 1.30 on loans of this type.  Nevertheless, the loan had a DSC ratio of only 0.77, meaning that the project's debt service requirements exceeded the expected cash flow.

62.     Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney also approved the loan on a "non-recourse" basis without R.N.'s guaranty.  Despite this, the loan lacked many of the exacting underwriting standards lenders generally require for loans made on a non-recourse basis, such as (a) a loan-to-value ratio of 75 percent or less; (b) a DSC ratio of 1.20 or more; and (c) a seasoned and stabilized property with a history of stable rental income and minimal vacancies.

63.     Additionally, Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved this loan despite lacking key material information presented in the Credit Memorandum. The Loan Policy required the Credit Memorandum to "include quantitative and qualitative information that reasonably will serve as a base for evaluation" of the proposed loan.  However, the Credit Memorandum supporting this loan and relied on by these Defendants failed to provide commentary and analysis on (a) R.N.'s background, qualifications and banking relationships; (b) credit reports on R.N. and his largest holdings; (c) detailed analyses of R.N.'s financial statements and tax returns; (d) appraisal, information on the type of appraisal and key assumptions such as vacancy rates; (e) verifications of R.N.'s largest assets, including the largest assets of his companies; (f) project plans and renovation budgets; (g) conditions and covenants of loan agreements; or (h) the inherent risks involved with the loan.  The lack of this information violated the standard set by the Bank's Loan Policy and generally accepted

1  banking policies and practices.

2      64.    The Credit Memorandum also relied on a "preliminary," rather than final,

3  appraisal to value the property.  Because repayment of the loan was closely tied to the

4  property's value, and especially considering R.N.'s minimal equity in the project,

5  Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber,

6  Sherman, J. Sweeney, M. Sweeney, and S. Sweeney should have demanded robust

7  information on the value of the collateral.  Without reviewing the contents of the final

8  appraisal (or a Bank-prepared review thereof), these Defendants did not have sufficient

9  information to approve this loan.

10     65.    Finally, the Bank's Loan Policy required loan officers to "document a

11  borrower's total indebtedness to the Bank on the loan approval document and determine

12  whether extension of additional credit would violate or approach the house lending

13  limit."  Especially given that the four loans approved on February 16, 2006 to R.N.-

14  controlled entities totaled $25,783,000, an analysis of R.N.'s total indebtedness should

15  have been required.  However, the Credit Memorandum for this loan lacked any

16  discussion of the Bank's total concentration of credit in R.N. and related entities.

17     66.    As a direct and proximate result of Defendants Edwards, Gartshore,

18  McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and

19  S. Sweeney's approval of this loan despite the foregoing deficiencies, this loan –

20  together with the related unsecured loan for $1,300,000 (*see infra* ¶¶ 67-72) – caused

21  First Regional damages estimated to be $3.40 million.

22          b.    Howe Arden Business Park LLC ($1.30 million)

23     67.    This loan, together with the related secured loan for $11,050,000 (*see supra*

24  ¶¶ 60-66), was intended to provide financing for the acquisition and renovation of the

25  Grass Meadows apartment complex.  In addition to the deficiencies applicable to all

26  four Howe Arden loans, described above (*see supra* ¶¶ 54-59), Defendants Edwards,

27  Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M.

28  Sweeney, and S. Sweeney acted with negligence, gross negligence, and in breach of

-17-

their fiduciary duties in approving this loan despite the following deficiencies.

68.     Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved this loan without critical financial and underwriting information.  The Loan Policy required the Credit Memorandum to "include quantitative and qualitative information that reasonably will serve as a base for evaluation" of the proposed loan.  The Credit Memorandum, therefore, should have included – but did not – commentary and analysis on (a) R.N.'s background, qualifications and banking relationships; (b) credit reports on R.N. and his largest holdings; (c) conditions and covenants of loan agreements; and (d) the inherent risks involved with the loan.  Without this information, the Credit Memorandum did not comply with the Bank's Loan Policy or generally accepted banking policies and practices.

69.     In addition, although R.N. was a guarantor of this loan, there was no serious attempt to understand R.N.'s complex financial situation.  The Credit Memorandum presented some basic information from R.N.'s personal financial statement and from the financial statements and tax returns of R.N.'s businesses, but there was almost no financial analysis of that information or how it affected R.N.'s creditworthiness.

70.     There was also no indication that the Bank verified the information from the financial statements of R.N. and his companies.  Because these financial statements were not prepared or audited by an independent certified public accountant, verification should have been considered essential.

71.     Without verification and analysis of R.N.'s financial stability, Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney should not have approved the loan unsecured.  For unsecured loans, the Loan Policy required that "[t]he borrower's balance sheet should evidence a high level of liquidity and tangible net worth…", and the borrower "should generate income which, after payment of all normal expenses, is more than

sufficient to adequately service the credit extended…"  Without even a basic analysis of R.N.'s finances, these Defendants could not have known enough about his financial condition and cash flows to justify providing him with an unsecured credit.

72.     As a direct and proximate result of Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney's approval of this loan despite the foregoing deficiencies, this loan – together with the related secured loan for $11,050,000 (*see supra* ¶¶ 60-66) – caused First Regional damages estimated to be $3.40 million.

c.     Howe Arden Business Park LLC ($12.02 million)

73.     This loan, together with the related unsecured loan for $1,414,000 (*see infra* ¶¶ 80-85), was intended to provide financing for the acquisition and renovation of the Hualapai Way apartment complex.  In addition to the deficiencies applicable to all four Howe Arden loans, described above (*see supra* ¶¶ 54-59), Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney acted with negligence, gross negligence, and in breach of their fiduciary duties in approving this loan despite the following deficiencies.

74.     Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved the loan even though the project had inadequate debt service coverage.  The Bank's Loan Policy required a DSC ratio of at least 1.00, and generally accepted banking practices require a minimum DSC ratio in the range of 1.20 to 1.30 on loans of this type.  Nevertheless, this loan – together with the debt service requirements of the related unsecured loan for $1,414,000 (*see infra* ¶¶ 80-85) – had a DSC ratio of only 0.75, meaning that the project's debt service requirements exceeded the expected cash flow.

75.     Additionally, Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved this loan despite lacking key material information presented in the Credit Memorandum. The Loan Policy required the Credit Memorandum to "include quantitative and

-19-

qualitative information that reasonably will serve as a base for evaluation" of the proposed loan. However, the Credit Memorandum supporting this loan and relied on by these Defendants failed to provide commentary and analysis on (a) R.N.'s background, qualifications and banking relationships; (b) credit reports on R.N. and his largest holdings; (c) detailed analyses of R.N.'s financial statements and tax returns; (d) appraisal, information on the type of appraisal and key assumptions such as vacancy rates; (e) verifications of R.N.'s largest assets, including the largest assets of his companies; (f) project plans and renovation budgets; (g) conditions and covenants of loan agreements; or (h) the inherent risks involved with the loan. The lack of this information violated the standard set by the Bank's Loan Policy and generally accepted banking policies and practices.

76.    Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney also approved the loan on a "non-recourse" basis without R.N.'s guaranty. Despite this, the loan lacked many of the exacting underwriting standards lenders generally require for loans made on a non-recourse basis, such as (a) a loan-to-value ratio of 75 percent or less; (b) a DSC ratio of 1.20 or more; and (c) a seasoned and stabilized property with a history of stable rental income and minimal vacancies.

77.    The Credit Memorandum also relied on a "preliminary," rather than final, appraisal to value the property. Because repayment of the loan was closely tied to the property's value, and especially considering R.N.'s minimal equity in the project, Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney should have demanded robust information on the value of the collateral. Without reviewing the contents of the final appraisal (or a Bank-prepared review thereof), these Defendants did not have sufficient information to approve this loan.

78.    Finally, the Bank's Loan Policy required loan officers to "document a borrower's total indebtedness to the Bank on the loan approval document and determine

1  whether extension of additional credit would violate or approach the house lending

2  limit." Especially given that the four loans approved on February 16, 2006 to R.N.-

3  controlled entities totaled $25,783,000, an analysis of R.N.'s total indebtedness should

4  have been required. However, the Credit Memorandum for this loan lacked any

5  discussion of the Bank's total concentration of credit in R.N. and related entities.

6      79.    As a direct and proximate result of Defendants Edwards, Gartshore,

7  McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and

8  S. Sweeney's approval of this loan despite the foregoing deficiencies, this loan –

9  together with the related unsecured loan for $1,414,000 (*see infra* ¶¶ 80-85) – caused

10 First Regional damages estimated to be $5.50 million.

        d.    Howe Arden Business Park LLC ($1.41 million)

12     80.    This loan, together with the related secured loan for $12,019,000 (*see supra*

13 ¶¶ 73-79), was intended to provide financing for the acquisition and renovation of the

14 Hualapai Way apartment complex. In addition to the deficiencies applicable to all four

15 Howe Arden loans, described above (*see supra* ¶¶ 54-59), Defendants Edwards,

16 Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M.

17 Sweeney, and S. Sweeney acted with negligence, gross negligence, and in breach of

18 their fiduciary duties in approving this loan despite the following deficiencies.

19     81.    Defendants Edwards, Gartshore, McCullough, Nicholson, Schilling,

20 Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved this loan

21 without critical financial and underwriting information. The Loan Policy required the

22 Credit Memorandum to "include quantitative and qualitative information that

23 reasonably will serve as a base for evaluation" of the proposed loan. The Credit

24 Memorandum, therefore, should have included – but did not – commentary and analysis

25 on (a) R.N.'s background, qualifications and banking relationships; (b) credit reports on

26 R.N. and his largest holdings; (c) conditions and covenants of loan agreements; and (d)

27 the inherent risks involved with the loan. Without this information, the Credit

28 Memorandum did not comply with the Bank's Loan Policy or generally accepted

-21-

1    banking policies and practices.

2        82.    In addition, although R.N. was a guarantor of this loan, there was no

3    serious attempt to understand R.N.'s complex financial situation.  The Credit

4    Memorandum presented some basic information from R.N.'s personal financial

5    statement and from the financial statements and tax returns of R.N.'s businesses, but

6    there was almost no financial analysis of that information or how it affected R.N.'s

7    creditworthiness.

8        83.    There was also no indication that the Bank verified the information from

9    the financial statements of R.N. and his companies.  Because these financial statements

10   were not prepared or audited by an independent certified public accountant, verification

11   should have been considered essential.

12       84.    Without verification and analysis of R.N.'s financial stability, Defendants

13   Edwards, Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J.

14   Sweeney, M. Sweeney, and S. Sweeney should not have approved the loan unsecured.

15   For unsecured loans, the Loan Policy required that "[t]he borrower's balance sheet

16   should evidence a high level of liquidity and tangible net worth…", and the borrower

17   "should generate income which, after payment of all normal expenses, is more than

18   sufficient to adequately service the credit extended…"  Without even a basic analysis of

19   R.N.'s finances, these Defendants could not have known enough about his financial

20   condition and cash flows to justify providing him with an unsecured credit.

21       85.    As a direct and proximate result of Defendants Edwards, Gartshore,

22   McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, M. Sweeney, and

23   S. Sweeney's approval of this loan despite the foregoing deficiencies, this loan –

24   together with the related secured loan for $12,019,000 (*see supra* ¶¶ 73-79) – caused

25   First Regional damages estimated to be $5.50 million.

26       **iv.  Secured California Investments, Inc. ($10.00 million)**

27       86.    On or around July 6, 2006, Defendants Edwards, Gartshore, McCullough,

28   Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved a

-22-

renewal of a $6,000,000 existing line of credit and an increase of $4,000,000 to Secured California Investments, Inc. ("SCI") for a total amount of $10,000,000. The Credit Memorandum stated the purpose of the loan was to finance "short-term business-related expenses such as deposits, escrow fees, soft costs, etc."

87.    Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved the loan negligently, grossly negligently, and in breach of their fiduciary duties. The Bank's Loan Policy required "an analysis and discussion of the borrower's cash flow on an operating cash flow basis" for credits where – as here – "cash flow is identified as a primary or secondary source of repayment." However, these Defendants approved the loan despite a lack of analysis and discussion of SCI's cash flow. The Credit Memorandum ambiguously identified "asset conversion" as the primary source of repayment, but there was no indication of what assets would be converted, how such assets might be converted, or whether the Bank knew or understood what this was supposed to mean. Therefore, the secondary source of repayment – "business income/guarantor income" – was the *de facto* source of repayment for the loan, and Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney should have required a cash flow analysis.

88.    Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney also failed to require a meaningful evaluation of the borrower's business. Although financial statements were apparently available in the loan file, the Credit Memorandum did not address numerous questions that should have arisen in connection with how this company operated – for example, asset descriptions and verifications.

89.    Additionally, Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney failed to require a discussion of the implications for the Bank's risk profile as a consequence of the borrower forming a new company, SCI Real Estate Investments, LLC, in 2005. In fact,

there was no indication that the Bank understood what the loan's funds would be used for, as indicated by the stated vague purpose of the loan to provide financing for "short-term business-related expenses such as deposits, escrow fees, soft costs, etc." This should have been particularly a cause for concern, given the sizeable increase in the line of credit from $6,000,000 to $10,000,000.

90.     Moreover, the borrower's assets were largely concentrated in illiquid assets.  According to SCI's 2005 financial statement, it had a reported net worth of $11,000,000, yet had zero cash assets reported on its balance sheet.  The Credit Memorandum recognized as a weakness of the loan that the borrowers' "assets [were] in real property, which is slow to convert to cash."  Perhaps most egregiously, Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved the loan – which was dependent on the borrower's cash flow for repayment – despite the fact that the borrower's financial statement reported a net income of <u>negative</u> $1,221,808 for the prior year.

91.     Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney also approved the loan despite a lack of verification of the borrower's and guarantors' assets.  The Bank's Loan Policy stated, "Verification of major asset values is very important and may be required.  This verification is significant when such assets are centered in real estate, whose liquidity and value is highly sensitive to changes in economic conditions."  None of the investment properties and real estate entities listed on the financial statements were appraised.  Moreover, no credit investigations and trade checks had been performed.

92.     Moreover, the Bank's Loan Policy required "[s]ound credit practices and principles [to] be applied to each loan request.  The Bank cannot properly ascertain the true quality of the loan, nor properly serve the best interests of the borrowing customers without full understanding of the following factors: purpose of the loan, intended sources of repayment, repayment ability, rate and terms, overall financial condition and trends, availability and value of collateral, knowledge of the borrower's financial

-24-

affairs." Of these, only the "rate and terms" were reasonably complete.

93. Given the lack of analysis and verification of the borrower and guarantors' financial situations and weak underwriting, approving the loan unsecured was unjustifiable. The Bank's Loan Policy stipulated that "[u]nsecured loans are intended for only the strongest and most creditworthy borrowers, and should be reserved for such customers." Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney could not have known whether SCI was one of the "strongest and most creditworthy borrowers" because they failed to require a complete and competent analysis and evaluation of the borrower's and guarantors' finances.

94. As a direct and proximate result of Defendants Edwards, Gartshore, McCullough, Nicholson, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney's approval of this loan despite the foregoing deficiencies, First Regional suffered damages estimated to be $9.00 million.

### v. Villas at Sparks Marina, LLC ($24.59 million)

95. On or around November 2, 2006, Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved a $24,594,000 loan to Villas at Sparks Marina, LLC. The loan was intended to provide financing to construct 49 residential condos, 3 retail condos and a parking structure for 299 cars.

96. Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney acted with negligence, gross negligence, and in breach of their fiduciary duties in approving this loan without sufficient financial information or analysis. The Bank's Loan Policy warned that the "Bank [could not] properly ascertain the true quality of the loan, nor properly serve the best interests of the borrowing customers without full understanding of the following factors: purpose of the loan, intended sources of repayment, repayment ability, rate and terms, overall financial condition and trends, availability and value of the collateral, and

-25-

knowledge of the borrower's financial affairs."  Nevertheless, these Defendants approved the loan despite no discussion of "the current and anticipated trends in the market relative to historical trends or patterns" as required by the Loan Policy. Similarly, the analysis supporting "sale of units" as the primary source of repayment was inadequate.

97.     Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney also should have required – but did not – an analysis of the guarantor's ability to service the debt if called upon.  The Bank needed to make the loan on the assumption that the property would not be developed or sold for some time beyond the 18-month term of the loan.  Although debt service was covered by the interest reserve for the term of the loan, any prudent lender would want to have some reasonable assurance that debt service could be met, if need be, for some period of time beyond 18 months.  Even though the guarantor was effectively the secondary source of repayment, the loan was approved without a thorough review of the guarantor's financial statements, a determination of his solvency, or verification of his assets and income.  No credit checks, trade checks, or litigation checks were performed for the guarantor, nor were there any reports regarding the guarantor's relationships or track records with other lenders.

98.     The financial information on hand for the guarantor also did not meet the requirements of the Loan Policy.  The Loan Policy required at least two years of financial statements and tax returns, yet the loan was approved with only one year of each.  Additionally, Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney should have also insisted on audited financial statements from the guarantor given the project's size, complexity, and the importance of the guarantor's support.

99.     Furthermore, there were a number of other deficiencies that should have caused Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney to decline the loan.  First, there was no

-26-

discussion of the project's viability in the Credit Memorandum.  Second, the required building permits were not yet in place at the time of approval, placing an additional risk of project delay on the Bank.  Third, the project was based near Reno, Nevada, which was outside the Bank's lending territory.

100.   As a direct and proximate result of Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney's approval of this loan despite the foregoing deficiencies, First Regional suffered damages estimated to be $15.33 million.

### vi.  Residencia LLC ($12.45 million)

101.   On or around December 14, 2006, Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved a $12,450,000 loan to Residencia LLC.  The loan was intended to provide construction financing for the development of 8 condominium units located in Oceanside, California.

102.   Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney were negligent, grossly negligent, and breached their fiduciary duties in approving the loan despite warning signs suggesting that the borrower and guarantor were unqualified.  Although the guarantor listed his annual income as $610,000 on his loan application, his 2004 and 2005 tax returns – the most recent available at the time of approval – showed adjusted gross income of $167,607 and negative $78,031 respectively.  Additionally, income reported on the Credit Memorandum was internally inconsistent.  The Credit Memorandum showed business income and rental/partnership income of negative $353,257 for 2005, which was partially offset by $261,145 in capital gains for a net 2005 income of negative $92,112.  Yet, the Credit Memorandum concluded without justification that the guarantor's 2005 net income was $505,565.  This conclusion does not mathematically make sense.  Moreover, there is no indication that the Bank verified the guarantor's reported income or assets.

103.   The discrepancies with the guarantor's reported income should have been grounds for denying the loan.  Although the loan funded a reserve account to finance the interest payments for the 24-month term, there was no indication that the guarantor would be able to make interest payments if the project was delayed.  If the project was delayed, the Bank would be dependent on the borrower and guarantor to make the required debt service payments of approximately $1,720,150 per year on the loan and a subordinate loan for the project, plus interest on $3,100,000 of other loans that financed non-income producing property.  Although a global cash flow analysis was not done, the guarantor's reported cash on hand plus annual net income was nowhere near the amounts needed to carry his debt once the interest reserves were depleted.

104.   Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney approved the loan despite other red flags and problems with the credit.  For example, the Credit Memorandum incorrectly calculated the loan-to-value ratio based on the appraisal's "aggregate retail value as if complete," rather than the "as if complete" value.  The "aggregate retail value as if complete" does not take into account the bulk discount the Bank would have to apply if it were forced to sell off the collateral to repay the loan.  The loan was also approved and funded even though the necessary building permits were not yet issued, placing additional unnecessary risk of delay on the Bank.

105.   As a direct and proximate result of Defendants Edwards, Gartshore, McCullough, Nicholson, O'Rourke, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney's approval of this loan despite the foregoing deficiencies, First Regional suffered damages estimated to be $2.30 million.

### vii.  Crestridge Estates, LLC ($16.58 million)

106.   On or around April 5, 2007, Defendants Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, and M. Sweeney approved a $16,575,000 loan to Crestridge Estates, LLC.  The loan was intended to refinance a land loan at another bank of $15,114,920, establish an interest reserve of $1,000,000 and

cover closing costs of $460,080.

107.   Defendants Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, and M. Sweeney acted with negligence, gross negligence, and in breach of their fiduciary duties in approving the loan.  For example, these Defendants approved the loan without critical financial information and analysis on the borrower.  Although the Loan Policy advised that "evaluation of the borrower is the most important function of the underwriting process," and required a minimum of two years of financial statements and tax returns, these Defendants approved the loan without any financial information on the borrower.  Furthermore, the borrower was 100 percent owned by the principal's trust.  However, the Credit Memorandum lacked any financial statements, tax returns, or any other credit information on the trust, and there is no indication that the Bank even obtained a copy of the trust agreement prior to approval.

108.   Additionally, Defendants Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, and M. Sweeney approved the loan without adequate financial information or analysis on the guarantor.  Only a single financial statement of the guarantor was considered, in contravention of the Loan Policy.  Moreover, the financial statement indicated that approximately 90 percent of the guarantor's wealth was concentration in illiquid real estate investments.  The financial statement was presented on a "net equity" basis whereby liabilities were netted out against the property values, which obscured the guarantor's other liabilities or ongoing financial obligations.  The statement also appears to have been prepared by the guarantor himself; there is no indication that the statement was prepared by a certified public accountant or other accounting professional.  No statements on the guarantor's income or cash flow were considered.  There is no indication that the Bank verified the guarantor's assets prior to approval.

109.   The loan was approved even though the sale of the property – the primary source of repayment – was subject to a number of conditions, and was therefore uncertain.  For example, the Credit Memorandum supporting the loan notes that the sale

-29-

was dependent on "recordation of a tentative tract map" and a "commitment of the City to donate an adjacent 2.5 acre parcel." There was a substantial risk that the sale might not go through and the guarantor would be called upon to service the debt.

110.   Other information crucial for Defendants Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, and M. Sweeney to make an informed judgment on the credit was also missing. The Bank's Loan Policy required the Bank to obtain and analyze (a) credit reports and litigation checks on the principals; (b) relationships of the borrower and principals with other lenders; (c) background information on the borrower, the principals and owners; and (d) current and anticipated trends in the market relative to historical trends or patterns. Other than the guarantor's incomplete financial statement discussed above and some limited background information on the guarantor, none of the foregoing information was obtained or analyzed.

111.   As a direct and proximate result of Defendants Gartshore, McCullough, Nicholson, Schilling, Schreiber, Sherman, J. Sweeney, and M. Sweeney's approval of this loan despite the foregoing deficiencies, First Regional suffered damages estimated to be $9.85 million.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF – NEGLIGENCE
### (AGAINST GARTSHORE, MCCULLOUGH, NICHOLSON, O'ROURKE, SCHILLING, J. SWEENEY, AND S. SWEENEY)

112.   Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1-111 of this Complaint, as though fully set forth herein.

113.   Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, J. Sweeney, and S. Sweeney, during the period of time each was an officer of the Bank, owed to First Regional the duty to use reasonable care, skill and diligence in the performance of their duties, especially in connection with the Bank's commercial real estate lending functions.

-30-

114.   Defendant Gartshore, as President and CEO, among other duties, was responsible for the overall management of the Bank, including but not limited to, overseeing First Regional's commercial loan department and ADC/CRE lending.  As a member of the SLC, Defendant Gartshore was responsible for, among other duties, approving all lending activities and related Bank operations up to the Bank's legal lending limit.  He had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally accepted prudent lending practices and principles; informing himself about proposed loans and risks those loans posed to the Bank prior to approval; ensuring that loans he approved were underwritten in a safe and sound manner; ensuring that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that loans he approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.  Defendant Gartshore, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

115.   Defendant McCullough, as COO and EVP, among other duties, was responsible for overseeing the day-to-day operations of the Bank.  As a member of the SLC, Defendant McCullough was responsible for, among other duties, approving all lending activities and related Bank operations up to the Bank's legal lending limit.  He had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally accepted prudent lending practices and principles;

-31-

informing himself about proposed loans and risks those loans posed to the Bank prior to approval; ensuring that loans he approved were underwritten in a safe and sound manner; ensuring that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that loans he approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.  Defendant McCullough, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

116.   Defendant Nicholson, as EVP and Senior Real Estate Officer, among other duties, was responsible for obtaining and maintaining loans secured by real estate.  As a member of the SLC, Defendant Nicholson was responsible for, among other duties, approving all lending activities and related Bank operations up to the Bank's legal lending limit.  She had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, preparing Credit Memoranda for with at least the minimum information and analysis required by the Loan Policy; ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally accepted prudent lending practices and principles; informing herself about proposed loans and risks those loans posed to the Bank prior to approval; ensuring that loans she approved were underwritten in a safe and sound manner; ensuring that loans she approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that loans she approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit. Defendant Nicholson, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

117.   Defendant O'Rourke, as a commercial loan officer and EVP Regional

Manager, among other duties, was responsible for obtaining and maintain commercial loans.  As a member of the SLC, Defendant O'Rourke was responsible for, among other duties, approving all lending activities and related Bank operations up to the Bank's legal lending limit.  She had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally accepted prudent lending practices and principles; informing herself about proposed loans and risks those loans posed to the Bank prior to approval; ensuring that loans she approved were underwritten in a safe and sound manner; ensuring that loans she approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that loans she approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.  Defendant O'Rourke, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

118.   Defendant Schilling, as EVP of the Los Angeles Branch, among other duties, was responsible for managing the operations of the Bank's Los Angeles and Anaheim offices.  As a member of the SLC, Defendant Schilling was responsible for, among other duties, approving all lending activities and related Bank operations up to the Bank's legal lending limit.  He had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally accepted prudent lending practices and principles; informing himself about proposed loans and risks those loans posed to the Bank prior to approval; ensuring that loans he approved were

underwritten in a safe and sound manner; ensuring that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that loans he approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit. Defendant Schilling, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

119.   Defendant J. Sweeney, as CEO, among other duties, was responsible for overseeing the general operations of the Bank, including its ADC and CRE lending, and as CCO, among other duties, was responsible for pre-screening loans before they were submitted for approval to the Credit Committee. As a member of the SLC, Defendant J. Sweeney was responsible for, among other duties, approving all lending activities and related Bank operations up to the Bank's legal lending limit. He had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business. These duties included, but were not limited to, ensuring Credit Memoranda contained at least the minimum information and analysis required by the Loan Policy before being presented for approval by the SLC; ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally accepted prudent lending practices and principles; informing himself about proposed loans and risks those loans posed to the Bank prior to approval; ensuring that loans he approved were underwritten in a safe and sound manner; ensuring that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that loans he approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit. Defendant J. Sweeney, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

-34-

120.   Defendant S. Sweeney, as EVP and General Counsel, among other duties, was responsible for overseeing legal matters with respect to the Bank and assisting in a variety of other matters and transactions, including loans.  As a member of the SLC, Defendant S. Sweeney was responsible for, among other duties, approving all lending activities and related Bank operations up to the Bank's legal lending limit.  He had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank followed and complied with its Loan Policy, loan approval process, and generally accepted prudent lending practices and principles; informing himself about proposed loans and risks those loans posed to the Bank prior to approval; ensuring that loans he approved were underwritten in a safe and sound manner; ensuring that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that loans he approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.  Defendant S. Sweeney, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

121.   By their actions and inactions, as described specifically and generally herein, Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, J. Sweeney, and S. Sweeney, as officers of the Bank, repeatedly failed and on numerous occasions neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and in disregard of the risks, constituting breaches of their duties of care, as follows:

122.   As to Defendant Gartshore, his negligent acts include, without limitation:

   a.   Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent

and sound lending practices;

b. Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c. Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d. Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e. Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f. Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

123.      As to Defendant McCullough, his negligent acts include, without limitation:

a. Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c. Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d. Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e. Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f.  Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

124.  As to Defendant Nicholson, her negligent acts include, without limitation:

a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b.  Failing to ensure that Credit Memoranda prepared by her presented sufficient information and analysis;

c.  Failing to inform herself about proposed loans and the risks the loans posed to the Bank before she approved them;

d.  Failing to ensure that loans she approved were underwritten in a safe and sound manner;

e.  Failing to ensure that loans she approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f.  Failing to ensure that loans she approved did not create unsafe concentrations of credit;

g.  Failing to ensure that loans she approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

h.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

125.  As to Defendant O'Rourke, her negligent acts include, without limitation:

a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term

-37-

income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to ensure that Credit Memoranda prepared by her presented sufficient information and analysis;

c. Failing to inform herself about proposed loans and the risks the loans posed to the Bank before she approved them;

d. Failing to ensure that loans she approved were underwritten in a safe and sound manner;

e. Failing to ensure that loans she approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f. Failing to ensure that loans she approved did not create unsafe concentrations of credit;

g. Failing to ensure that loans she approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

h. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

126.    As to Defendant Schilling, his negligent acts include, without limitation:

a. Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c. Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d. Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e.  Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f.  Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

127.    As to Defendant J. Sweeney, his negligent acts include, without limitation:

a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b.  Failing to ensure that Credit Memoranda screened by him prior to being submitted for approval by the SLC contained sufficient information and analysis;

c.  Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

d.  Failing to ensure that loans he approved were underwritten in a safe and sound manner;

e.  Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f.  Failing to ensure that loans he approved did not create unsafe concentrations of credit;

g.  Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

h.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

128.   As to Defendant S. Sweeney, his negligent acts include, without limitation:

  a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

  b.  Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

  c.  Failing to ensure that loans he approved were underwritten in a safe and sound manner;

  d.  Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

  e.  Failing to ensure that loans he approved did not create unsafe concentrations of credit;

  f.  Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

  g.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

129.   Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, J. Sweeney, and S. Sweeney, during the period of time they were officers of the Bank, were therefore each negligent in abdicating his/her responsibilities to the Bank as officers, unreasonably failing to investigate material facts, and failing to use reasonable care in carrying out his/her responsibilities to the Bank, thereby failing to act with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.  Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, J. Sweeney, and S. Sweeney also failed to act in good faith by ignoring the danger their negligence was causing to the Bank, and by negligently underwriting, recommending, and approving loans contrary to safe and sound banking

-40-

practices, as further described in this Complaint, in connection with the Bank's commercial lending functions.  These breaches of duty are exemplified by the Loans described herein.

130.   As a direct and proximate result of Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, J. Sweeney, and S. Sweeney's negligence, with respect to each Defendant, the FDIC-R suffered damages in an amount to be proven at trial, in at least the following amounts: Gartshore - $72.46 million; McCullough - $72.46 million; Nicholson - $72.46 million; O'Rourke - $44.71 million; Schilling - $61.16 million; J. Sweeney - $72.46 million; and S. Sweeney - $62.61 million.

## SECOND CLAIM FOR RELIEF – GROSS NEGLIGENCE
### (AGAINST ALL DEFENDANTS; IN THE ALTERNATIVE AGAINST GARTSHORE, MCCULLOUGH, NICHOLSON, O'ROURKE, SCHILLING, J. SWEENEY, AND S. SWEENEY)

131.   Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1-130 of this Complaint, as though fully set forth herein.

132.   Section 1821 (k) of FIRREA holds directors or officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  California law defines gross negligence as either a want of even scant care or an extreme departure from the ordinary standard of care.

133.   Each of the Defendants, as members of the SLC, owed First Regional a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  This duty of care included, but was not limited to, the following:

   a.  To inform themselves about proposed loans and the risks the loans posed to the Bank before they approved them;

   b.  To approve loans that conformed with the Bank's Loan Policy;

   c.  To ensure that any loans they approved were underwritten in a safe and

sound manner;

    d.  To ensure that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

    e.  To ensure that any loans they approved did not create unsafe and unsound concentrations of credit.

134.  Defendants Gartshore, McCullough, Nicholson, O'Rourke, Schilling, J. Sweeney, and S. Sweeney, as officers of the Bank, owed the duties described in paragraphs 122 through 128.

135.  Defendants Edwards, Gartshore, McCullough, Schreiber, Sherman, J. Sweeney, M. Sweeney, and S. Sweeney, as directors of the Bank, owed, among other duties, a duty to monitor the Bank's operations, including its ADC and CRE lending, to ensure they were controlled adequately and were in compliance with laws and policies.

136.  For each of the Loans, Defendants, through their gross negligence, breached their duties of care by, among other things, failing to exercise even scant care or acting in a manner constituting an extreme departure from the ordinary standard of care as follows:

137.  As to Defendant Edwards, his grossly negligent acts include, without limitation:

    a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

    b.  Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

    c.  Failing to ensure that loans he approved were underwritten in a safe and sound manner;

    d.  Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

-42-

e.  Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f.  Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

138.   As to Defendant Gartshore, his grossly negligent acts include, without limitation:

a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b.  Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c.  Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d.  Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e.  Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f.  Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

139.   As to Defendant McCullough, his grossly negligent acts include, without limitation:

-43-

a.   Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b.   Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c.   Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d.   Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e.   Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f.   Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g.   Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

140.     As to Defendant Nicholson, her grossly negligent acts include, without limitation:

a.   Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b.   Failing to ensure that Credit Memoranda prepared by her presented sufficient information and analysis;

c.   Failing to inform herself about proposed loans and the risks the loans posed to the Bank before she approved them;

d.   Failing to ensure that loans she approved were underwritten in a safe and

-44-

sound manner;

e. Failing to ensure that loans she approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f. Failing to ensure that loans she approved did not create unsafe concentrations of credit;

g. Failing to ensure that loans she approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

h. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

141.    As to Defendant O'Rourke, her grossly negligent acts include, without limitation:

a. Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to ensure that Credit Memoranda prepared by her presented sufficient information and analysis;

c. Failing to inform herself about proposed loans and the risks the loans posed to the Bank before she approved them;

d. Failing to ensure that loans she approved were underwritten in a safe and sound manner;

e. Failing to ensure that loans she approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f. Failing to ensure that loans she approved did not create unsafe concentrations of credit;

g. Failing to ensure that loans she approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

-45-

h.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

142.   As to Defendant Schilling, his grossly negligent acts include, without limitation:

a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b.  Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c.  Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d.  Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e.  Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f.  Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g.  Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

143.   As to Defendant Schreiber, his grossly negligent acts include, without limitation:

a.  Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

-46-

b. Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c. Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d. Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e. Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f. Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

144.     As to Defendant Sherman, his grossly negligent acts include, without limitation:

a. Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c. Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d. Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e. Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f. Failing to ensure that loans he approved complied with the Bank's Loan

Policy and prudent and sound lending practices; and

g. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

145.    As to Defendant J. Sweeney, his grossly negligent acts include, without limitation:

a. Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to ensure that Credit Memoranda screened by him prior to being submitted for approval by the SLC contained sufficient information and analysis;

c. Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

d. Failing to ensure that loans he approved were underwritten in a safe and sound manner;

e. Failing to ensure that loans he approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f. Failing to ensure that loans he approved did not create unsafe concentrations of credit;

g. Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

h. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

146.    As to Defendant M. Sweeney, her grossly negligent acts include, without limitation:

-48-

a. Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to inform herself about proposed loans and the risks the loans posed to the Bank before she approved them;

c. Failing to ensure that loans she approved were underwritten in a safe and sound manner;

d. Failing to ensure that loans she approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e. Failing to ensure that loans she approved did not create unsafe concentrations of credit;

f. Failing to ensure that loans she approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

147.     As to Defendant S. Sweeney, his grossly negligent acts include, without limitation:

a. Disregarding the risks to the financial safety and soundness of the Bank in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies and prudent and sound lending practices;

b. Failing to inform himself about proposed loans and the risks the loans posed to the Bank before he approved them;

c. Failing to ensure that loans he approved were underwritten in a safe and sound manner;

d. Failing to ensure that loans he approved were secured by sufficiently

valuable collateral to prevent or minimize the risk of loss to the Bank;

e. Failing to ensure that loans he approved did not create unsafe concentrations of credit;

f. Failing to ensure that loans he approved complied with the Bank's Loan Policy and prudent and sound lending practices; and

g. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, *i.e.*, "red flags" with respect to the Bank's ADC/CRE lending.

148. Each Defendant was therefore grossly negligent in that his or her manner of carrying out his or her duties and responsibilities to the Bank constituted a want of even scant care or an extreme departure from the ordinary standard of care, as further described in this Complaint.

149. As a direct and proximate result of these Defendants' gross negligence, with respect to each Defendant, the FDIC-R suffered damages in an amount to be proven at trial, in at least the following amounts: Edwards - $47.28 million; Gartshore - $72.46 million; McCullough - $72.46 million; Nicholson - $72.46 million; O'Rourke - $44.71 million; Schilling - $61.16 million; Schreiber - $57.13 million; Sherman - $61.02 million; J. Sweeney - $72.46 million; M. Sweeney - $72.46 million; and S. Sweeney - $62.61 million.

## THIRD CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTIES
## (IN THE ALTERNATIVE AGAINST ALL DEFENDANTS)

150. Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1-149 of this Complaint, as though fully set forth herein.

151. In the alternative, during all or part of the relevant times, Defendants were officers and/or directors of First Regional who served on the SLC.

152. As SLC members, officers and/or directors, Defendants owed fiduciary duties of care and loyalty to First Regional to act with the utmost care and in the best interests of the Bank, including when evaluating and voting to approve a loan. That

-50-

duty, in turn, included but was not limited to the following duties:

    a.  To require that sufficiently detailed, current and reliable information be provided upon which the directors and officers could make prudent decisions, including the use of current technology and internal control procedures to timely identify problems and allow for early remediation;

    b.  To support and foster the Bank's internal risk management functions;

    c.  To enforce policies and procedures designed to ensure that loans would not be made based on inadequate or inaccurate information;

    d.  To inform themselves about proposed loans and the risks the loans posed to the Bank before they determined whether to approve them;

    e.  To ensure that loans which required approval pursuant to the Loan Policy were sent through the correct approval process;

    f.  To approve only those loans that conformed with the Bank's Loan Policy;

    g.  To ensure that any loans they approved and were underwritten in a safe and sound manner; and

    h.  To ensure that loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank.

153.   Defendants breached their fiduciary duties by, among other things:

    a.  Causing the Bank to make commercial real estate loans with little or no regard for borrowers' ability to repay them;

    b.  Failing to ensure that loans, including the Loans, were underwritten in a safe and sound manner;

    c.  Failing to ensure that loans, including the Loans, were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

    d.  Failing to ensure that loans, including the Loans, conformed to the Bank's Loan Policy.

154.   In committing the foregoing breaches, the Defendants acted clearly

unreasonably under the circumstances known to them at the time, and otherwise wholly abdicated their corporate responsibilities by closing their eyes to known risks, did not act in good faith and did not act with the belief that their actions were in the best interests of the Bank.

155. As a direct and proximate result of Defendants' breach of fiduciary duties, with respect to each Defendant, the FDIC-R suffered damages in an amount to be proven at trial, in at least the following amounts: Edwards - $47.28 million; Gartshore - $72.46 million; McCullough - $72.46 million; Nicholson - $72.46 million; O'Rourke - $44.71 million; Schilling - $61.16 million; Schreiber - $57.13 million; Sherman - $61.02 million; J. Sweeney - $72.46 million; M. Sweeney - $72.46 million; and S. Sweeney - $62.61 million.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff the FDIC-R requests relief from Defendants as follows:

A. For compensatory and consequential damages, jointly and severally, in a minimum amount of $72.46 million and any excess amount to be proven at trial;

B. For its costs of suit against all Defendants;

C. For prejudgment interest;

D. For attorneys' fees, and costs for the investigation and litigation; and

E. For such other and further relief as this Court deems just and proper.

DATED: January 28, 2014

Respectfully submitted,

RITA M. HAEUSLER
DENNIS S. KLEIN
HUGHES HUBBARD & REED LLP

By: _____
Rita M. Haeusler
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
FIRST REGIONAL BANK

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff the FDIC-R hereby demands trial by jury in this action.

3

DATED: January 28, 2014

4

RITA M. HAEUSLER
DENNIS S. KLEIN
HUGHES HUBBARD & REED LLP

5

6

By:_____

7

Rita M. Haeusler
Attorneys for Plaintiff

8

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
FIRST REGIONAL BANK

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Beverly Reid O'Connell_____ and the assigned Magistrate Judge is _____John E. McDermott_____ .

The case number on all documents filed with the Court should read as follows:

### 2:14-cv-00668 BRO-JEMx

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____January 28, 2014_____
Date

By  SBOURGEOIS_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| [x] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST REGIONAL BANK,<br><br>*Plaintiff(s)*<br>v.<br>FRED M. EDWARDS, H. ANTHONY GARTSHORE, THOMAS E. MCCULLOUGH, CAROLYN ZARRO NICHOLSON, COLLEEN CARSON (NÉE O'ROURKE), KLAUS SCHILLING, RICHARD E. SCHREIBER, LAWRENCE J. SHERMAN, JACK A. SWEENEY, THE ESTATE OF MARILYN J. SWEENEY, AND STEVEN J. SWEENEY,<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

CV14-0668 BRO-JEMx

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Rita M. Haeusler, Esq.                                 Telephone:  (213) 613-2800
HUGHES HUBBARD & REED LLP              Facsimile:  (213) 613-2950
350 S. Grand Avenue, 36th Floor
Los Angeles, CA  90071-3442

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:   JAN 28 2014   _____

_____
*Signature of Clerk or Deputy Clerk*

1184


American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Federal Deposit Insurance Corporation as Receiver for First Regional Bank, Los Angeles, CA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Hughes Hubbard & Reed LLP
350 S. Grand Ave., 36th Floor
Los Angeles, CA 90071
Tel: (213) 613-2800

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Fred Edwards, H. Anthony Gartshore, Thomas E. McCullough, Carolyn Zarro Nicholson, Colleen Carson (Née O'Rourke), Klaus Schilling, Richard E. Schreiber, Lawrence J. Sherman, Jack A. Sweeney, the Estate of Marilyn J. Sweeney, Steven J. Sweeney

County of Residence of First Listed Defendant  Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No  **X MONEY DEMANDED IN COMPLAINT:** $ 72,460,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
12 U.S.C. § 1819 – Damages for negligence, gross negligence, and/or breach of fiduciary duty

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/Etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt Org.
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/Exchange
☒ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Info. Act
☐ 896 Arbitration
☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.)
☐ 153 Recovery of Overpayment of Vet. Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment

**REAL PROPERTY CONT.**
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpratice
☐ 365 Personal Injury-Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**TORTS**
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accomodations
☐ 445 American with Disabilities-Employment
☐ 446 American with Disabilities-Other
☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus/Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405 (g))
☐ 864 SSID Title XVI
☐ 865 RSI (405 (g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**FOR OFFICE USE ONLY:**  Case Number: _____

CV-71 (11/13)

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?**<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☒ Yes  ☐ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☒ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☐ NO   ☒ YES

If yes, list case number(s):   SACV 10-00537-CJC(MLGx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _____   DATE:  01/28/2014

Rita M. Haeusler

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com